# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **KAREN L. OUTSEY SALANQUIT,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.: 2:05-CV-2221-RDP** |
| | } | |
| **SAMFORD UNIVERSITY, et al.,** | } | |
| | } | |
| **Defendants.** | } | |

## MEMORANDUM OPINION

## I.      INTRODUCTION

Currently pending before the court is Defendants Samford University, Nena Sanders, Joy Whatley, Tyra Walker, and Jennifer Coleman's Motion for Summary Judgment (Doc. # 21) filed on November 22, 2006.  Plaintiff has filed her response and Defendants have filed their reply.  The court attempted to hold a hearing on this motion, and all other pending motions, on January 11, 2007; however, Plaintiff failed to appear.  Thereafter, on January 26, 2007, Defendants moved this court to supplement the summary judgment record, and the court granted this request on January 29, 2007.  Plaintiff filed a response to this material on February 14, 2007, so that the motion was fully briefed and under submission on that date.  For reasons more fully outlined below, the court finds Defendants' motion is due to be granted and all of Plaintiff's claims against Defendants should be dismissed.

## II.      STATEMENT OF FACTS

Plaintiff attended the UAB Nursing School (which was her first attempt as a nursing student) from 1979 until 1983.  (Doc. # 25 Ex. F, DEF00012).  On March 17, 1983, UAB dismissed her from the School of Nursing because she had received two "Fs" in clinical courses.  (Doc. # 24 Ex. B

Attach. 2).  Plaintiff contested that dismissal contending the failure of her courses were unjust and claiming that her instructor, J. Hathaway, harassed her in an "unnatural manner" of a "sexual nature." (Doc. # 25 Ex. C, DEF00441).  She threatened UAB with a civil action and stated to administrators that she thought she should be compensated.  (Doc. # 24 Ex. C, DEF00447).  Her complaints were handled by UAB administrators who followed a grievance policy and investigated her allegations. They found Plaintiff's assertions were unsubstantiated and that Plaintiff herself failed to corroborate her allegations during various meetings. (Doc. # 25 Ex. C, DEF00317–00320, DEF00418).  Plaintiff was denied readmission to the UAB School of Nursing in 1984 and again in 1988.  (Doc. # 25 Ex. C, DEF00416, DEF00468).  Plaintiff claims that at present she has no recollection of the nature of her complaint at UAB.  (Doc. # 26 Ex. S "Nature of UAB Complaint").  However, when Plaintiff later requested a letter of recommendation from UAB for her application to Samford University School of Nursing in 2001, UAB complied and sent a letter to Samford stating she would be eligible for re-application to UAB after she provided information "detailing additional education and experiences received that have prepared her for reentry into nursing school."  (Doc. # 25 Ex. C DEF00324–326).

Plaintiff enrolled at Samford University in July 2001 and applied for admission to the Ida V. Moffett School of Nursing at Samford University in May 2002.  (Doc. # 24 Ex. B, Attach. 1; Doc. # 26 Ex. F).  On her application to the Nursing School, one question asked whether she had ever been denied admission to another nursing school.  Contrary to the UAB records evidencing two denials of admission to the UAB Nursing School in 1984 and 1988, Plaintiff marked "NO" in response to the question.  (Doc. # 26 Ex. F, DEF 00013).

Samford School of Nursing's admission policies state that "[a] student who received a D or F in a nursing course from another institution will be considered on an individual basis . . . ." (Doc. # 26 Ex. R, 155).  Because Plaintiff had received failing grades while enrolled at UAB School of Nursing, Dean Marian Baur ("Baur") of Samford required her to provide documentation from UAB regarding her eligibility for readmission before Samford would consider her for admission. (Doc. # 24 Ex. A 84–88; Doc. # 26 Ex. E).  After UAB provided this documentation, Plaintiff was admitted into the School of Nursing for the Fall Semester of 2002. (Doc. # 26 Ex. E).

According to the progression policy for the Samford School of Nursing, "Failure of two nursing courses or one nursing course twice with grades of D or F will terminate the student from the School of Nursing." (Doc. # 26 Ex. R, 156).  Plaintiff acknowledged that she received a copy of the Samford University Catalog containing this policy and understood that failure of two courses would result in dismissal from the School of Nursing.  (Doc. # 24 Ex. A 83, 92).

As students advance through the nursing curriculum at Samford, they are required to take classes that are composed of both classroom lecture and actual patient care in a clinical setting. (Doc. # 26 Ex. Q ¶ 6).  The School of Nursing has relationships with several area hospitals and healthcare facilities which allow the nursing students to receive hands-on training by assigning the students patients, and allowing them to independently assess and implement the patient's healthcare needs. The students' performance is overseen and evaluated by Samford nursing instructors. (*Id.* ¶ 7). Students are graded separately on their performance in the classroom and in clinical evaluations; however, a student must receive satisfactory grades in both settings in order to pass the course. (*Id.* ¶ 6).  Furthermore, the School of Nursing Undergraduate Student Handbook also explains that a student can fail a course as a result of unsafe or unsatisfactory clinical practice.  (Doc. # 24 Ex. B

3

Attach. 4 at 17; Doc. # 24 Ex. A 93–94; Doc. # 24 Ex. B Attach. 5).  Plaintiff acknowledged that she received a copy of the handbook.  (*Id*.)

During the Fall 2002 semester, Plaintiff was enrolled in her first clinical nursing course, Nursing 361, "Foundations for Clinical Nursing," and her instructor was Debbie Walker ("Walker"). (Doc. # 24 Ex. A 97; Doc. # 24 Ex. B Attach. 6).  In Walker's written evaluation of Plaintiff's clinical performance, Walker gave two grades of "Unsatisfactory" under the category of "respects confidentiality of data related to patient care."  These grades were the result of Plaintiff requesting and accepting photocopies of a patient's chart from the unit secretary.  (Doc. # 24 Ex. B Attach. 7 DEF00032).  Although Plaintiff testified that she was not responsible for the copied charts, the patient whose chart was photocopied was assigned to Plaintiff.  (Doc. # 24 Ex. A 111; Doc. # 26 Ex. S "Copying Chart").  Prior to participating in clinical courses, Plaintiff was required to sign a confidentiality statement, which includes the provision that, "I will not permit any person to examine or make copies of any report or document prepared by me, coming into my possession or to which I have access." (Doc. # 24 Ex. B Attach. 8).  Additionally, Walker's evaluation of Plaintiff's performance included comments that she "struggles with application in the clinical area" and "needs improvement" in her clinical and psychomotor performance.  (Doc. # 24 Ex. B Attach. 7 DEF00033).

In Fall 2003, Plaintiff enrolled in Nursing 372, "Adult Health I," and her clinical instructors were Dr. Geri Beers ("Beers") and Ashley Turner ("Turner").  (Doc. # 24 Ex. A 122–23).  For that course, three "unsatisfactory" clinical grades would result in failure of the course, and Plaintiff was aware of this policy.  (Doc. # 24 Ex. B Attach. 9; Doc. # 24 Ex. A 123).  Turner completed a written evaluation of Plaintiff's clinical performance, and recorded that, on September 17, 2003, Plaintiff

repeatedly spent extended lengths of time sitting in her clients' rooms which invaded the clients' privacy as well as made her unavailable for learning opportunities. (Doc. # 24 Ex. B Attach. 9 DEF00034, DEF00037, DEF00042). Turner also reported that Plaintiff's lack of availability that day caused the nursing staff to have to assume responsibility for tasks Plaintiff was assigned to complete. (Doc. # 24 Ex. B Attach. 9 DEF00037, DEF00042). On October 8, 2003, Plaintiff was assigned to spend the day working alongside an experienced nurse named Janet Fitts. (Doc. # 24 Ex. B Attach. 9 DEF00042). Turner's notes from that day reflect that Fitts expressed several concerns regarding Plaintiff's lack of communication, initiative, and participation over the course of the day, and  Turner graded Plaintiff "Unsatisfactory" for that clinical day.  (*Id.*).  Plaintiff received the written comments made by Turner, and provided handwritten responses to each of the observations recorded, but now contends that these evaluations should not be given credence. (Doc. # 24 Ex. A 128; Doc. # 24 Ex. B Attach. 9 DEF00042; Doc. # 26 Ex. S "Turner Comment" & "Turner Fitts").

After the midterm of the semester, Plaintiff's clinical instructor was Dr. Beers. (Doc. # 24 Ex. A 124; Doc. # 26 Ex. M ¶ 10).  Dr. Beers' evaluation included comments that Plaintiff had failed to perform many basics of nursing care, including hand-washing and checking the patient's identification band prior to administering medication. (Doc. # 24 Ex. B Attach. 9 DEF00040).

In Spring 2004, Plaintiff was enrolled in Nursing 452, "The Childrearing Family," a senior-level nursing course for which her classroom lecture and clinical instructor was Jennifer Coleman ("Coleman"). (Doc. # 24 Ex. A 147–49; Doc. # 26 Ex. O ¶¶ 3, 10).  The course overview for this class explains that "a clinical grade of satisfactory must be earned in any nursing course regardless of the theory grade achieved. . . .  Three unsatisfactory grades in a clinical laboratory constitute an unsatisfactory clinical semester grade, thus a failure in the course," and that same policy is repeated

on another page of the course overview.  (Doc. # 24 Ex. B Attach. 10 DEF00123–DEF000124; Doc. # 26 Ex. O ¶ 9).  Plaintiff acknowledges that she received a copy of this course overview and understood that three unsatisfactory clinical grades would result in failure of the course.  (Doc. # 24 Ex. A 151–52).

Coleman prepared daily evaluations of Plaintiff's performance, which Plaintiff received. (Doc. # 24 Ex. A 154–57; Doc. # 24 Ex. B Attach. 11; Doc. # 26 Ex. O ¶¶ 7, 11).  During this clinical course, Plaintiff received a total of three "Unsatisfactory" clinical days, resulting in a final grade of "Unsatisfactory" for the overall clinical evaluation.  (Doc. # 24 Ex. B Attach. 11 DEF00085; Doc. # 26 Ex. O ¶ 10).  Coleman concluded in her evaluation that Plaintiff, "consistently failed to meet the standards of safe nursing care.  She has jeopardized patient safety by frequently attempting to administer incorrect medications, wrong dosages, and failing to be aware of drug side effects." (Doc. # 24 Ex. B Attach. 11 DEF00087).  For example, on February 26, 2004, Coleman graded Plaintiff's clinical work as "unsatisfactory," specifically noting that Plaintiff was unorganized and inattentive to her patient's needs, made illegible notes on the charts, failed to record vital signs for one patient, and did not complete her nursing care on time.  (*Id.* DEF00100; *see also* Doc. # 26 Ex. S "Illegible Charting").  Additionally, on that same day, Coleman noted that Plaintiff failed to educate her patient and the patient's parent on a new oral medication before attempting to administer the drug, even though the patient suffered from a chronic condition and would be medicating at home. (Doc. # 24 Ex. B Attach. 11 DEF00100).  Finally, still on the same clinical day, Coleman also noted that after Plaintiff was informed at 8:00 a.m. of a patient's need to be discharged by noon, Plaintiff did not begin the paperwork until 12:05 p.m., showed minimal knowledge of the necessary patient instructions, and as a result the patient was not discharged until 1:30 p.m.  (*Id.*).

Coleman notified Assistant Dean Joy Whatley ("Whatley") of Plaintiff's performance issues, and on February 27, 2004, Coleman, Whatley, and Nena Sanders ("Sanders"), met with Plaintiff in an effort to understand how to assist her in improving her clinical performance.  (Doc. # 26 Ex. O ¶ 29; Doc. # 26 Ex. P ¶ 10).  Over the following weeks, Coleman continued to note concerns about Plaintiff's inattentiveness, disorganization, and lack of preparation, and counseled her on March 11, 2004 about these and other concerns. (Doc. # 24 Ex. B Attach. 11 DEF00107; Doc. # 26 Ex. O ¶¶ 32, 33).  On March 15, 2004, Coleman followed up with Plaintiff by providing her with a list of clinical behaviors that are required for safe and satisfactory patient care, and by requesting that Plaintiff provide a list of things that would assist her in improving her performance. (Doc. # 24 Ex. B Attach. 11 DEF00109; Doc. # 26 Ex. O ¶ 37).  Despite Coleman taking these steps aimed at assisting her, Plaintiff contends that her performance did not warrant this assistance.  (Doc. # 26 Ex. S "General Denial").

On March 31, 2004, Coleman graded Plaintiff as "unsatisfactory" for the day following her care of a two-year-old child with dehydration, and a three-week old infant with meningitis.  (Doc. # 24 Ex. B Attach. 11 DEF00116; Doc. # 26 Ex. O ¶¶ 44–45).  Coleman reported in the evaluation that Plaintiff: (1) erroneously calculated the child's urine output prior to the discharge of the child; (2) was thereafter unable to communicate how she calculated the amount; and (3) was unaware of the significance of the hydration total for a dehydrated child.  (Doc. # 24 Ex. B Attach. 11 DEF000114–DEF00116; *see also* Doc. # 26 Ex. S "Diaper Denial").  Also on March 31, Coleman noted that Plaintiff failed to implement the care necessary for an infant with meningitis.  (Doc. # 24 Ex. B Attach. 11 DEF00116).

On April 1, 2004, Plaintiff received a third "unsatisfactory" for the clinical day. (Doc. # 24 Ex. B Attach. 11 DEF00119). Tyra Walker, a part-time clinical instructor, reported that Plaintiff was assigned to administer medication to a fifteen-month old patient. As Plaintiff pulled each medication in preparation to go see the patient, she announced the medication, and Tyra Walker noted that she announced one of the medications twice. (Doc. # 24 Ex. B Attach. 11 DEF00116). Tyra Walker reported that she did not correct Plaintiff at that time, so that she would have an opportunity to correct her error. (Doc. # 26 Ex. N ¶ 17). Tyra Walker further recorded that after going into the client's room, Plaintiff again announced each medication aloud as she administered it in front of the patient's mother. (Doc. # 24 Ex. B Attach. 11 DEF00116). Tyra Walker recorded that as Plaintiff was administering the medicine to the child, she announced one medication for a second time and proceeded to uncap the syringe to administer another dosage of the medication. (Doc. # 24 Ex. B Attach. 11 DEF00119). Tyra Walker immediately removed the syringe from Plaintiff's hands and escorted her from the room. (Doc. # 26 Ex. N ¶ 20; Doc. # 24 Ex. A 229–30). After Tyra Walker explained the critical mistake to Plaintiff, Plaintiff became very defensive and asked to go home, saying "may the Lord be with you for what you do unto others" and "you sow evil seeds, you get an evil crop; what goes around comes around, and you will reap what you sow" in response to Tyra Walker's explanation. (Doc. # 24 Ex. B Attach. 11 DEF 00119; Doc. # 24 Ex. A 232; Doc. # 26 Ex. S "Two Meds  Words to Walker").

After receiving her third "unsatisfactory" clinical, Plaintiff withdrew from all of her courses for Spring 2004. (Doc. # 24 Ex. B Attach. 6). In August 2004, Dean Baur and Associate Dean Joy Whatley met with Plaintiff to discuss her unsatisfactory clinical performance and to develop a plan to improve. (Doc. # 24 Ex. B Attach. 12).

During Fall 2004, Plaintiff re-enrolled in Nursing 452, "The Childrearing Family," and her clinical instructors were again Tyra Walker and Jennifer Coleman.  (Doc. # 24 Ex. A 270, 279–80; Doc. # 26 Ex. O ¶¶ 48, 49; Doc. # 26 Ex. N ¶ 30).  Plaintiff again received three "unsatisfactory" clinical days in the course and, thus, an "unsatisfactory" as her overall final clinical grade.  (Doc. # 24 Ex. B Attach. 13 DEF00046; Doc. # 26 Ex. N ¶¶ 50, 56, 61).  During one of these "unsatisfactory" clinical days, on October 28, 2004, Tyra Walker noted that one of the staff nurses repeatedly questioned Plaintiff's behavior with the children, and said Plaintiff did not appear to know what she was doing.  Tyra Walker further reported that Plaintiff  went into a patient's room and woke up the child for no reason, and did not know what to do with the IV pump when it starting beeping. (Doc. # 26 Ex. N ¶¶ 31–34).  Later the same day, the patient's mother complained to Tyra Walker and the physician, that Plaintiff kept waking up her child and asking lots of questions, despite the fact that she had previously been given instructions to allow this patient to rest.  The mother stated that she felt that Plaintiff was incompetent, and she did not want her around her child anymore.  Plaintiff received an "unsatisfactory" for this day. (Doc. # 24 Ex. B Attach. 13 DEF00076–DEF00078, DEF00059).  However, Plaintiff contends that these events were "made up." (Doc. # 26 Ex. S "Patient Complaint").

Again, on November 10, 2004, Plaintiff received another "unsatisfactory" grade for the day. (Doc. # 26 Ex. O ¶ 56).  Coleman noted that Plaintiff left the unit without reporting her absence to the nurse, and she took the nurses' notes with her to another floor, forcing the nurse to track Plaintiff down in order to retrieve the notes before she could continue with each patient's care.  (Doc. # 24 Ex. B Attach. 13 DEF00081).  Coleman noted that, upon their return, the notes were incomplete for each patient, and one patient had no notes at all.  She also noted that Plaintiff did not complete the

final assessments for her patients, and that documentation for the patients was late.  (Doc. # 24 Ex. B Attach. 13 DEF00081).

On November 11, 2004, Plaintiff received the third "unsatisfactory" grade for a clinical day and the course.  (Doc. # 24 Ex. O ¶¶ 57, 61).  Coleman's evaluation for that day noted that Plaintiff: (1) failed to report elevated vital signs on a neonate; (2) was unable to calculate IV flow rate for administering antibiotics; (3) failed to immediately document medication administration; (4) was unable to place a hep-lock on a patient without detailed instructions; (5) failed to follow proper procedures for handling contaminated equipment for a patient with contact precautions; (6) again failed to report her absence before leaving the unit; (7) failed to indicate that a she had not administered a medication to a patient; and (8) left the nurses' notes unattended on a counter while Plaintiff was away.  (Doc. # 24 Ex. B Attach. 13 DEF00084).  On November 17, 2004, Coleman received a letter from the Unit Supervisor from one of the clinical locations where Plaintiff had worked.  (Doc. # 26 Ex. O ¶ 68 & Attach.1).  That correspondence indicated several inappropriate behaviors by Plaintiff and expressing concern with the level of care given by Plaintiff.  (*Id.*).

As a result of her failure to satisfactorily perform the clinical requirements for Nursing 452, Plaintiff was informed that she failed the course.  (Doc. # 26 Ex. Q ¶ 24).  In accordance with the School of Nursing's progression policies, Plaintiff's second failure of Nursing 452 subjected her to dismissal from the nursing school.  The new School of Nursing Dean, Nena Sanders ("Sanders"), and Assistant Dean Joy Whatley ("Whatley") reviewed the clinical evaluations prepared by each of Plaintiff's instructors during the course of her education at Samford, and determined that Plaintiff should not be allowed to continue at the School of Nursing.  (Doc. # 26 Ex. P ¶¶ 8,17; Doc. # 26 Ex.

Q ¶¶ 9, 14; Doc. # 26 Ex. R).  Whatley prepared a report which detailed the events which supported

the decision to dismiss Plaintiff  from the School of Nursing.  (Doc. # 26 Ex. G).

On January 12, 2005, Sanders and Whatley held a meeting with Plaintiff to notify her that

she was being administratively withdrawn from the program due to her failure of the pediatric

nursing course twice.  (Doc. # 26 Ex. Q ¶ 19).  On January 14, 2005, Plaintiff was notified by a letter

from Dean Sanders that she would not be allowed to continue in the School of Nursing.  (Doc. # 26

Ex. Q ¶ 24; Doc. # 26 Ex. H).  On February 25, 2005, Samford University's Provost, Dr. Bradley

Creed, notified Plaintiff by letter that he had reviewed her claim that she was wrongfully dismissed

from the School of Nursing, and that it was his determination, based on several faculty members'

assessments of Plaintiff's performance, that there was clear evidence that Plaintiff's performance

was deficient and the School of Nursing's decision to dismiss her would be upheld.  (Doc. # 26 Ex.

Q ¶ 25; Doc. # 26 Ex. I).  On April 6, 2005, then Samford University President, Thomas Corts,

received a letter from Plaintiff further contesting her dismissal, with claims that Coleman had graded

her unfairly, required her to complete additional clinicals, made false evaluations, and subjected her

to "undeserved oppression."  (Doc. # 26 Ex. J DEF00144).  President Corts responded to Plaintiff's

letter on April 22, 2005, and informed her that the decision made by the School of Nursing was

based on professional judgment, and supported by objective evidence.  Corts further stated that he

spent time speaking with the nursing faculty in order to make sure that Samford's policies and

procedures were followed and applied fairly.  (Doc. # 26 Ex. Q ¶ 26; Doc. # 26 Ex. J DEF00143).

## III.    SUMMARY JUDGMENT STANDARD

Summary judgment is proper only when there is no genuine issue of material fact and the

moving party is entitled to judgment as a matter of law.  FED. R .CIV. P. 56(c).  The substantive law

will identify which facts are material and which are irrelevant.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson,* 477 U.S. at 248.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  *See id.* at 249.  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.  *See id.* at 324.

The method used by the party moving for summary judgment to discharge its initial burden on the motion depends on whether that party bears the burden of proof on the issue at trial.  *See Fitzpatrick*, 2 F.3d at 1115-17 (citing *United States v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991) (en banc)).  If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; *i.e.*, facts that would entitle it to a directed verdict if not controverted at trial.  *See Fitzpatrick*, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial. Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question. This method requires more than a simple statement that the non-moving party cannot meet its burden at trial. But it does not require evidence negating the non-movant's claim; it simply requires that the movant point out to the district court that there is an absence of evidence to support the non-moving party's case. *See Fitzpatrick*, 2 F.3d at 1115–16. If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts. *See Lewis v. Casey*, 518 U.S. 343, 358 (1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

## IV.   ANALYSIS

### A.   Plaintiff Has Failed to Present Substantial Evidence to Support a Claim under Title VI of the Civil Rights Act of 1964.

Plaintiff claims that she was subject to race and age discrimination in violation of Title VI of the Civil Rights Act of 1964. 42 U.S.C. § 2000d (2007). Section 601 of Title VI prohibits

13

discrimination on the basis of race, color or national origin by a recipient of federal funds against the participants in (or beneficiaries of) any program or activity receiving federal financial assistance conducted by the recipient. *See id.*; *see also Robinson v. Vollert*, 602 F.2d 87, 89 (5th Cir. 1979).[1] Specifically, the statute requires that a claimant prove that she was denied participation, based on her race, in a federally funded program for which she was otherwise qualified. 42 U.S.C. § 2000d. In order to maintain a claim under Title VI, Plaintiff must demonstrate intentional discrimination. *Alexander v. Sandoval*, 532 U.S. 275, 281 (2001) (Title VI reaches only instances of intentional discrimination); *Burton v. City of Belle Glade*, 178 F.3d 1175, 1202 (11th Cir. 1999) (same).

**1.    Plaintiff's Age Discrimination Claim Is Not Cognizable under Title VI.**

Plaintiff's Amended Complaint seeks relief under Title VI of the Civil Rights Act of 1964 based upon her claims of race and age discrimination. (Doc. # 3 at 2). The plain language of Title VI clearly indicates that it applies only to claims of discrimination based on race, color, or national origin. 42 U.S.C. § 2000d. Plaintiff's age discrimination claims are not viable under this statute, and are due to be dismissed.[2]

---

[1]In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit Court of Appeals adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

[2]Even if Plaintiff had alleged an age discrimination claim under Age Discrimination Act of 1975, 42 U.S.C. § 6102 (2006) (prohibiting discrimination on the basis of age in "any program or activity receiving Federal financial assistance"), this claim would also fail because the statute does not create a private right of action. Additionally, any attempt on the part of Plaintiff to assert a claim under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.* (2007), would not succeed because it is undisputed that she was not an "employee" covered by the Act, which seeks to prevent age discrimination by employers.

14

### 2.   Plaintiff Cannot Establish a *Prima Facie* Case of Race Discrimination.

Racial discrimination claims under Title VI are evaluated under the framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792,(1973). In order to prevail without direct evidence of discrimination, Plaintiff must first present a *prima facie* case establishing that: (1) she is a member of a protected class; (2) she suffered an adverse action; (3) she was qualified or otherwise met legitimate expectations for continued enrollment; and, (4) her dismissal occurred under circumstances giving rise to the inference of unlawful discrimination. *See Herron v. Virginia Com. University*, 366 F. Supp. 2d 355 (E.D. Va. 2004) (applying the *McDonnell Douglas* framework to an academic dismissal).

Once a plaintiff establishes a *prima facie* case, the burden then shifts to the defendant to articulate some legitimate, non-discriminatory reason for the dismissal, which is clear, reasonably specific, and worthy of credence. *Hall v. Ala. Ass'n of School Bds.*, 326 F.3d 1157, 1166 (11th Cir. 2003). The Eleventh Circuit has described this burden on the defendant as "exceedingly light." *Batey v. Stone*, 24 F.3d 1330, 1334 (11th Cir.1994) (citations omitted).

If a defendant satisfies its burden, the presumption against it is rebutted, and the plaintiff must show that defendant's proffered reason for the dismissal is a pretext for an illegal motive. *McDonnell Douglas*, 411 U.S. at 802–804; *Rojas v. Florida*, 285 F.3d 1339, 1342 (11th Cir. 2002). At this phase, Plaintiff must "introduce significantly probative evidence showing the asserted reason is merely pretext for discrimination." *Zaben v. Air Products. & Chems., Inc.*, 129 F.3d 1453, 1457 (11th Cir.1997).

Plaintiff's claims of discrimination fail because there is no evidence—much less substantial evidence—to support the last two elements of her *prima facie* case. She was dismissed from the

nursing school after failing to meet the required standards, and her dismissal was pursuant to established policy, which she professed to understand.  (Doc. # 26 Ex. Q ¶¶ 19, 24; Doc. # 26 Ex. H; Doc. # 26 Ex. R, 156; Doc. # 24 Ex. B Attach. 4 at 17, Attach. 5, Attach. 9, Attach. 10 DEF00123–DEF000124, Attach. 13 DEF00046; Doc. # 24 Ex. A 83, 91–94, 123; Doc. # 26 Ex. N ¶¶ 50, 56, 61; Doc. # 26 Ex. O ¶ 9).  Even more importantly, Plaintiff presents no evidence that suggests her dismissal was motivated by discriminatory animus.

Even if Plaintiff had succeeded in establishing a *prima facie* case of racial discrimination (which she has not), Defendants Samford, Coleman, and Walker have outlined in detail the unacceptable behavior displayed by Plaintiff, and how several University officials evaluated Plaintiff's overall performance in reaching the conclusion to dismiss her from the School of Nursing. (Doc. # 26 Ex. O ¶¶ 10–61; Doc. # 26 Ex. N ¶¶ 8–34; Doc. # 26 Ex. P ¶¶ 9–21).  In fact, Plaintiff's own deposition testimony reflected her assumption that Dean Sanders' decision to dismiss her was based on her failing clinical grades and the application of the school's policy.  (Doc. # 24 Ex. A 293).

Plaintiff points to the grades she received in the *classroom* and argues those grades demonstrate her competence in the *clinical setting* and, therefore, argues she did not deserve the low grades she received in her clinical work.  However, this argument fails as a matter of law, fact, and logic.  The testimony of several professors identified Plaintiff's problem as that of "putting theory into practice."  (Doc. # 24 Ex. B Attach. 7 DEF033, Attach. 11  DEF0087, DEF00117).  Moreover, numerous faculty members made repeated attempts to assist Plaintiff in identifying her performance issues and discussed with her strategies for improvement. (Doc. # 26 Ex. P ¶¶ 10, 15; Doc. # 26 Ex. L ¶¶ 6–13; Doc. # 26 Ex. O ¶¶ 18, 22, 29, 33, 35–36, 51).  Finally, this court declines to delve into

the academic decision based on the deliberate and professional judgment of several professors and administrators, as Plaintiff has made no showing that there was any other basis for such decision, let alone an unlawful one. *Regents of Univ. of Mich. v. Ewing* 474 U.S. 214, 225 (1985) ("When judges are asked to review the substance of a genuinely academic decision, such as this one, they should show great respect for the faculty's professional judgment. Plainly, they may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment."); *see also Mauriello v. Univ. of Med. & Dentistry of N.J.*, 781 F.2d 46, 51 (3rd Cir. 1986) ("In an educational setting, a student bears a heavy burden in persuading the courts to set aside a faculty's judgment of academic performance."); *Susan M. v. N.Y. Law Sch.*, 556 N.E. 2d 1104 (N.Y. Ct. App. 1990) ("As a general rule, judicial review of grading disputes would inappropriately involve the courts in the very core of academic and educational decision making by a college or university.")

In the Title VII context, the Eleventh Circuit has often reminded district courts that they do not sit as a super-personnel board. *Chapman v. AI Transport*, 229 F.3d 1012, 1034-35 (11th Cir. 2000). This same principle applies here, in the Title VI context–this court cannot perform the role of a super-academic review committee. Once again, the court concludes that Plaintiff's final grade was reached after careful deliberation by the instructors, after seeking additional counsel from the Assistant Dean and the Dean of the School of Nursing, and the decision was reviewed and upheld by the Provost and the President of the University. (Doc. # 26 Ex. Q ¶¶ 14–17). Based on the professional judgment of Samford faculty and following the School of Nursing's stated policy, it was determined that Plaintiff should be dismissed from the School of Nursing. There is no evidence to demonstrate that the decision to dismiss Plaintiff was motivated by any factor other than a

compelling interest in the competent and safe administration of health services by graduates (and

perhaps students) of the nursing Program.[3]

---

[3]As the court finds there is no substantial evidence to support elements of Plaintiff's *prima facie* claim of discrimination (*i.e.*, she cannot show that she was qualified or otherwise met legitimate expectations for continued enrollment in Samford's School of Nursing and she cannot show that her dismissal occurred under circumstances giving rise to the inference of unlawful discrimination) it will not address the other necessary elements of Plaintiff's *prima facie* case or the remaining elements of *McDonnell Douglas*'s burden-shifting framework. However, the court notes that Plaintiff also has the burden, as part of her *prima facie* case, to identify similarly-situated nursing students who received more favorable treatment after failing two nursing courses. *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997); *see also Jones v. Bessemer Caraway Med. Ctr.*, 137 F.3d 1306, 1311 (11th Cir. 1998) ("If Plaintiff fails to identify similarly situated, non-minority employees who were treated more favorably, her case must fail because the burden is on her to establish her prima facie case."). Plaintiff has not done this and has admitted in her deposition testimony that she is not aware of any such individual. (Doc. # 24 Ex. A 250, 288–89).

Furthermore, even if Plaintiff could establish a *prima facie* case of intentional discrimination (which she cannot), she would then have to put forth evidence that, despite Defendant's articulated non-discriminatory reason for her dismissal (*i.e.*, that she failed two courses and was dismissed from the program due to the stated academic policies of the School of nursing), the real reason for her dismissal was race discrimination. *See Chapman v. AI Transport*, 229 F.3d 1012 (11th Cir. 2000); *see also Standard v. A.B.E.L. Serv. Inc.*, 161 F.3d 1318, 1333 (11th Cir. 1998) ("The heart of the pretext inquiry is not whether [the plaintiff] agrees with the reasons [the defendant] gives for the discharge, but whether [the defendant] really was motivated by those reasons."). Plaintiff has failed to demonstrate that any of the decision-makers involved in her dismissal were motivated by race, and, instead, has provided the court only with alleged comments that she contends support her discrimination claims. The law in this circuit is well-settled that such "allegations, opinions, and conclusory statements are insufficient to create an issue of fact as to show intent to discriminate." *Perryman v. West*, 949 F. Supp. 815, 821 (M.D. Ala. 1996) (quoting *Blount v. Ala. Coop. Extension Serv.*, 869 F. Supp. 1543, 1553 (M.D. Ala. 1994)); *see also Coutu v. Martin Co. Bd. of Comm'rs*, 47 F.3d 1068, 1073–74 ("[C]onclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where [an employer] has offered . . . extensive evidence of legitimate, non-discriminatory reasons for its actions."); *Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1376 (11th Cir. 1996) (same). Therefore, there is yet another reason to grant summary judgment for Defendants: Plaintiff has failed to point to any genuine issues of material fact regarding whether Defendants' proffered reasons for her dismissal were pretextual.

Finally, Plaintiff's claims against the individual named Defendants are due to be dismissed, because claims arising under Title VI of the Civil Rights Act do not create liability on the part of an individual defendant. *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1170 (11th Cir. 2003) (refusing to find liability under Title VI on the part of professor that gave challenged grade).

B.   **Plaintiff Has Failed to State a Claim upon Which Relief May Be Granted under 42 U.S.C. § 1983.**

Plaintiff also alleges that she is due relief for claims based on race and age discrimination under 42 U.S.C. § 1983, which prohibits the deprivation of plaintiff's constitutional rights by an individual or entity acting "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia."  42 U.S.C. § 1983 (1996).  These claims must fail because: (1) Defendants are not subject to suit under the named statute; (2) neither the individual Defendants nor Samford University are "state actors;" and (3) no individual Defendant was "acting under color of state law" when she participated in the decision to dismiss Plaintiff.

As stated above, to obtain relief under § 1983, Plaintiff must show that she was deprived of a federal right by a person acting under color of state law.  *See Willis v. University Health Servs., Inc.*, 993 F.2d 837, 840 (11th Cir. 1993).  The Supreme Court has held that state action requires both an alleged constitutional deprivation "caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible," and that "the party charged with the deprivation must be a person who may fairly be said to be a state actor."  *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999).  Thus, "the under-color-of-state-law element of § 1983 excludes from its reach merely private conduct, no matter how discriminatory or wrongful."  *Id.* (internal quotations and citations omitted); *see also Shortz v. United Parcel Serv.*, 179 Fed. App'x 644, 645 (11th Cir. 2006) (citing *Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1276–77 (11th Cir.2003)).

The individual Defendants in this case are employed by Samford University, a private entity which is not under the authority of the State of Alabama (or any other state), and  Plaintiff admits as much.  (Doc. # 24 Ex. A 311).  In fact, in *Killinger v. Samford University*, the Eleventh Circuit

19

found, as a matter of law, that "Samford University is doubtlessly a 'religious educational institution,'" which is in substantial part, "owned, supported, controlled, or managed by a religious association." 113 F.3d 196, 200–201 (11th Cir. 1997). Therefore, Samford University is not a state entity.

That undisputed fact does not end the inquiry, however. In the case of employees of a private entity, there are "three tests for establishing whether the actions of a private entity are attributable to the state: the public function test, the state compulsion test, and the nexus/joint action test." *Shortz*, 179 Fed. App'x at 645 (citing *Focus on the Family*, 344 F.3d at 1277) (other citations omitted). In order to characterize private individual action as that of the state, Plaintiff must first demonstrate that Samford University, the entity in question, is in fact a state entity or that its actions are otherwise attributable to the state. "The public function test is satisfied when private actors perform a function that is 'traditionally the exclusive prerogative of the state.' The state compulsion test limits state action to instances when the government has coerced or at least significantly encouraged the acts alleged to be unconstitutional. The nexus/joint action test is met when the state and the private party are in such a position of interdependence that the alleged conduct constitutes a joint action." *Id.* (citations omitted).

In her complaint, just as Plaintiff did not (and could not) aver that either the individual Defendants or Samford University were state actors or government employees/agency, she also did not assert (and the court has found nothing in the record to suggest) any facts that would establish state action by a private entity under any of the three tests used by this Circuit. Plaintiff cannot rely upon the public function test because Samford is not performing a function which is "traditionally the *exclusive* prerogative of the state." *See id.* (emphasis added). Although the state does operate

public educational facilities, it does not do so exclusively, as there are many private educational institutions throughout the country.  Her allegations also do not attribute state action to Samford or its employees under the state compulsion test because the conduct was not encouraged or coerced by the state. Finally, she can not demonstrate state action under the nexus/joint action test because she has neither alleged nor presented evidence of an interdependent relationship between Samford and the state or any connection between the two regarding her dismissal—the act in question.

It follows that Samford University is not a state entity, nor can its actions be attributed to the state under any other test.  Thus, the individual Defendant employees did not take any action "under color of state law," as they cannot, in any plausible way, be characterized as "state actors." Plaintiff's attempt to charge these private individuals and a private entity under § 1983 fails, and these claims are due to be dismissed.[4]

## V.    CONCLUSION

For the foregoing reasons, the court concludes that Defendants' Motion for Summary Judgment (Doc. # 21) is due to be granted, and all of Plaintiff's claims should be dismissed against Defendants.  The court will enter a separate order in accordance with this memorandum opinion.

**DONE** and **ORDERED** this ____24th____ day of April, 2007.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE

---

[4]Even if Plaintiff could show Samford University or any other Defendant was a state actor, for the reasons already stated, the court would nevertheless find that she has not established any discriminatory practice or decision by any of the Defendants.